United States District Court
Southern District of Texas
**ENTERED**
July 22, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| W. RAUL ARRIONDO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-14-2734 |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff W. Raul Arriondo ("Plaintiff" or "Arriondo") was assessed a trust fund recovery penalty under Internal Revenue Code § 6672 for the fourth quarter of 2008 and the first quarter of 2009 (the "period in question"). Arriondo sued defendant the United States of America ("Defendant" or "United States"), seeking a refund for overpayment of taxes and to be found not liable as a responsible person under I.R.C. § 6672.[1] Pending before the court is United States of America's Motion for Summary Judgment Against W. Raul Arriondo and Brief ("Motion for Summary Judgment") (Docket Entry No. 14). For the reasons stated below, the Motion for Summary Judgment will be granted, and this action will be dismissed.

---

[1] Plaintiff's Original Complaint ("Complaint"), Docket Entry No. 1.

## I.   Background

Arriondo began working for American Steel Building Company, Inc. ("American Steel") in early 2007 and served as CEO, president, treasurer, and a director.[2]  He remained at American Steel until after the company filed for bankruptcy on June 5, 2009.[3]  American Steel was the wholly owned subsidiary of American Industrial Investment Corporation, an Employee Stock Ownership Plan Company.[4]  Arriondo received an annual salary but was not an owner of American Steel or American Industrial Investment Corporation.[5]

---

[2]See Oral Deposition of W. Raul Arriondo ("Arriondo Deposition"), Exhibit 14 to Motion for Summary Judgment, Docket Entry No. 14-16, pp. 3:12-4:16.  Exhibit 14 includes four deposition transcript pages on each page of the attachment. Therefore, citations are to the electronic page number in Exhibit 14 followed by the deposition transcript page number (e.g., "3:12" references the third page of the electronically filed Exhibit 14 and the twelfth page of deposition transcript, which appears on page 3 of Exhibit 14). Texas Franchise Tax Public Information Report, Exhibit 2 to Motion for Summary Judgment, Docket Entry No. 14-4; Plaintiff and Counterclaim Defendant's Response to United States of America's First Set of Interrogatories ("Arriondo Interrogatory Responses"), Exhibit 3 to Motion for Summary Judgment, Docket Entry No. 14-5, p. 3 Interrogatory 1, p. 4 Interrogatory 8.  In October of 2007, Arriondo became American Steel's registered agent.  See Statement of Change of Registered Office/Agent, Exhibit 1 to Motion for Summary Judgment, Docket Entry No. 14-3.

[3]See Arriondo Deposition, Exhibit 14 to Motion for Summary Judgment, Docket Entry No. 14-16, pp. 16:64-17:65, p. 10:79, p. 23:89-90.

[4]See Arriondo Interrogatory Responses, Exhibit 3 to Motion for Summary Judgment, Docket Entry No. 14-5, p. 4 Interrogatory 8.

[5]See Arriondo Deposition, Exhibit 14 to Motion for Summary Judgment, Docket Entry No. 14-16, p. 3:11-12; p. 12:48 (Arriondo received the highest salary at American Steel).  See also Form 1040
(continued...)

-2-

Arriondo ran the business along with other employees and was part of the group that handled the day-to-day operations of the company, but he was focused on increasing sales.[6]  Arriondo met with company executives weekly and was informed about operations.[7]  At these weekly meetings, Arriondo always asked the financial director or controller if there was enough money to buy steel and to cover employee salaries.[8]

---

[5](...continued) U.S. Individual Income Tax Returns for Arriondo, 2007-2009, Exhibit 5 to Motion for Summary Judgment, Docket Entry No. 14-7; Declaration of Wilfredo Raul Arriondo ("Arriondo Declaration"), Exhibit B to W. Raul Arriondo's Opposition to United States of America's Motion for Summary Judgment ("Plaintiff's Response"), Docket Entry No. 17-3, p. 1 ¶¶ 2-3.

[6]See Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 17-3, p. 1 ¶¶ 6-7 ("American Steel had over 100 employees when I arrived when an organizational structure that provided management by department heads.  I managed the Company through the department heads, so that I could concentrate on increasing sales."); Arriondo Deposition, Exhibit 14 to Motion for Summary Judgment, Docket Entry No. 14-16, p. 7:26 (agreeing that he was included in the group that handled day-to-day operations); Plaintiff's Response, Docket Entry No. 18, p. 6 ¶ 6 ("Arriondo admits that he 'handled the day-to-day operations' but denies that he was involved with the detail of American Steel's departmental operations beyond the department heads.").

[7]Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 17-3, p. 1 ¶ 8; Arriondo Deposition, Exhibit 14 to Motion for Summary Judgment, Docket Entry No. 14-16, p. 6:23-24, p. 12:46, p. 15:57.

[8]See Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 17-3, p. 1 ¶ 8; id. ¶ 9 ("By covering employee salaries, I made it clear from the beginning that the term included paying the IRS for payroll taxes.  I was conscious of the need to pay the withholding taxes to the IRS and wanted assurances that payment would be made."); see also Arriondo Deposition, Exhibit 14 to Motion for Summary Judgment, Docket Entry No. 14-16, p. 6:24.

Arriondo had authority to hire and fire employees, the
authority to enter into contracts on behalf of American Steel, and
input into employee salary amounts.[9]   Arriondo was always an
authorized check signer at American Steel.[10]   Arriondo had access
to the company's books and records.[11]   American Steel received
monthly bank statements, and "[Arriondo] could therefore see how
much money American Steel was receiving and spending after he knew

---

[9]See Arriondo Deposition, Exhibit 14 to Motion for Summary
Judgment, Docket Entry No. 14-16, p. 6:23-24, p. 7:26-27, p. 12:48;
Arriondo Interrogatory Responses, Exhibit 3 to Motion for Summary
Judgment, Docket Entry No. 14-5, p. 3 Interrogatories 4, 5.

[10]See Arriondo Interrogatory Responses, Exhibit 3 to Motion for
Summary Judgment, Docket Entry No. 14-5, p. 5 Interrogatory 12
("Identify all . . . persons who were authorized to sign checks on
behalf of American Steel during the period in question."  "I could
sign checks.  Donna Latiolais was authorized to make electronic
payments and transfer money between accounts.").  The United States
asserts that Arriondo signed every check issued by American Steel
during the period in question and was the only one at the company
that signed checks See Motion for Summary Judgment, Docket Entry
No. 14, p. 10 ¶ 17; Sampling of Cancelled Checks written by
American Steel during the period in question, all bearing
Arriondo's signature, Exhibit 7 to Motion for Summary Judgment,
Docket Entry No. 14-9; Arriondo Deposition, Exhibit 14 to Motion
for Summary Judgment, Docket Entry No. 14-16, p. 17:66.  However,
Arriondo clarified that the director of finance, Donna Latiolais
("Latiolais") had a stamp of his signature that she used for checks
since he traveled often, although she refused to personally sign
checks for the company.  See Arriondo Declaration, Exhibit B to
Plaintiff's Response, Docket Entry No. 17-3, p. 2 ¶ 13.

[11]See Arriondo Deposition, Exhibit 14 to Motion for Summary
Judgment, Docket Entry No. 14-16, p. 8:31.

-4-

of the unpaid taxes."[12] Arriondo also had the authority to purchase and sell assets for American Steel during the period in question.[13]

American Steel faced financial challenges due to the economic downturn in 2008.[14] Arriondo was aware of that American Steel's finances were in trouble and that the company "always had a challenge" financially and "struggl[ed] with cash."[15] Additionally, the prior CEO of American Steel, John Garland, had cashed out his ownership upon departure, leaving American Steel with a large debt secured by company assets.[16]

---

[12]See id. at 9:33-34. See also Plaintiff's Response, Docket Entry No. 18, p. 11 ¶ 20. The bank statements went directly to Latiolais; Arriondo did not receive them personally. See Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 17-3, p. 2 ¶ 11.

[13]See Plaintiff's Response, Docket Entry No. 18, p. 12 ¶ 22; Arriondo Interrogatory Responses, Exhibit 3 to Motion for Summary Judgment, Docket Entry No. 14-5, p. 5 Interrogatory 14; Arriondo Deposition, Exhibit 14 to Motion for Summary Judgment, Docket Entry No. 14-16, p. 14:55.

[14]See Arriondo Deposition, Exhibit 14 to Motion for Summary Judgment, Docket Entry No. 14-16, p. 6:21-24, p. 12:46, p. 25:99-100.

[15]See id. at p. 6:21-24, p. 12:46, p. 17:66-67, p. 25:99-100; Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 17-3, p. 1 ¶¶ 4, 6-8;

[16]See Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 17-3, p. 1 ¶¶ 4, 6-8; Arriondo Deposition, Exhibit 14 to Motion for Summary Judgment, Docket Entry No. 14-16, pp. 6:24-7:25; 22:87 ("[W]hen I took over the company, the previous CEO had . . . inflated the value of the stock so he could cash out at a higher value when the company was never valued at the value that he stated prior.").

In April of 2009 the State of Texas sent American Steel a notice of levy for unpaid excise tax.[17]   Arriondo was aware of the "issues with the state controllers" towards the end of 2008.[18]

> Q:   So at the end of '08, you were aware that the corporation was having difficulty paying taxes owed to the State of Texas?
>
> A:   The sales taxes had not been paid which I remember when I had found out, I was furious and I said well, why isn't this -- is this not being paid, you need to take care of this right away.   And the -- and I think [Latiolais] said well, we don't have the funds.   And I said I don't care if we don't have the funds.   You need to go over there and make a payment arrangement because we can't be -- I said they're going to shut us down.   We can't do that.   That was -- that's how adamant I was about getting this thing taken care of.   But other than that, I had no other knowledge of anything else not having been paid.[19]

Latiolais, a certified public account and American Steel's director of finance, assured him that the state tax issue was a timing issue related to a tax return, and she was able to work out a payment schedule fairly easily.[20]   Arriondo did not investigate further or inquire about other potential tax issues.[21]

---

[17]See Arriondo Deposition, Exhibit 14 to Motion for Summary Judgment, Docket Entry No. 14-16, p. 17:66-67.   "[T]oward the tail end of '08 [Arriondo] instructed [Latiolais] to . . . make payment arrangements to pay these taxes" but he did not remember getting a levy letter from the state that "late into '09.").

[18]See Arriondo Deposition, Exhibit 14 to Motion for Summary Judgment, Docket Entry No. 14-16, p. 17:67-68.

[19]See id. at 17:68.

[20]See Arriondo Declaration, Docket Entry No. 17-3, p. 3 ¶ 22.

[21]See id.; Arriondo Deposition, Exhibit 14 to Motion for
(continued...)

Arriondo signed documents borrowing hundreds of thousands of dollars for American Steel on June 2, 2008, shortly before the period in question began.[22]   At one point (Arriondo thought it was March or April of 2009), Arriondo also advanced the company money to cover payroll, but he denies that he knew the financial situation was so bleak that American Steel could not survive.[23]

Throughout the period in question Arriondo was aware of the requirements to withhold and pay payroll taxes and to pay taxes quarterly.[24]   American Steel paid payroll taxes without incident for over a year after Arriondo began working there.[25]   However, American Steel's quarterly federal tax return forms (the "Forms 941") for the fourth quarter of 2008 and the first quarter of 2009 show taxes were still due when the returns were filed, with partial tax

---

[21](...continued)
Summary Judgment, Docket Entry No. 14-16, p. 17:67-68.

[22]See Commercial Security Agreement, Exhibit F to Plaintiff's Response, Docket Entry No. 17-7.   The United States characterizes this as borrowing money during the period in question, but, as Arriondo points out, the loan date was 06-02-2008, while the period in question began in the fourth quarter of 2008.   See Plaintiff's Response, Docket Entry No. 18, p. 12 ¶ 22.

[23]See Arriondo Deposition, Exhibit 14 to Motion for Summary Judgment, Docket Entry No. 14-16, p. 10:40, p. 21:82; see also Plaintiff's Response, Docket Entry No. 18, p. 12 ¶ 24.

[24]See Arriondo Deposition, Exhibit 14 to Motion for Summary Judgment, Docket Entry No. 14-16, p. 3:10, p. 16:61; Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 17-3, p. 1 ¶ 9.

[25]See Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 17-3, p. 1 ¶ 10; Form 941 for Third Quarter 2008, Exhibit L to Plaintiff's Response, Docket Entry No. 17-12.

deposits for the fourth quarter of 2008 and no tax deposits for the first quarter of 2009.[26]

Latiolais served as American Steel's director of finance from early 2008 until abruptly leaving in early 2009.[27]   Latiolais prepared, signed, and filed the tax return for the fourth quarter of 2008.[28]   She prepared the return for the first quarter of 2009, but left the company before filing it.[29]   Latiolais did not present Arriondo with the returns for his review, and had not done so in the past.[30]   Arriondo agreed that it was ultimately his responsibility to ensure payroll taxes owed were paid, that he did not follow up with Latiolais regarding payment of employment taxes, did not ask to see payroll tax deposits, and did not ask to see any

---

[26]See Form 941 for Fourth Quarter 2008 and Form 941 for First Quarter 2009, Exhibit 4 to Motion for Summary Judgment, Docket Entry No. 14-6.

[27]Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 17-3, p. 2 ¶¶ 11, 14; Declaration of Steve Dawson ("Dawson Declaration"), Exhibit C to Plaintiff's Response, Docket Entry No. 17-4, p. 1 ¶¶ 2, 3.

[28]See Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 17-3, p. 2 ¶¶ 11-13.

[29]See id.

[30]Id. at 2 ¶ 12.   Arriondo "admits he reviewed and signed Texas Franchise Tax Public Information Reports, pursuant to which he was listed as an officer and director of the Company.   Arriondo denies that this has any relevance to this case."   Plaintiff's Response, Docket Entry No. 18, p. 6 ¶ 8.   See Texas Franchise Tax Public Information Report, Exhibit 2 to Motion for Summary Judgment, Docket Entry No. 14-4.

evidence that the taxes were being paid, although he could have.[31]
Arriondo relied on Latiolais and the "sufficient, sophisticated"
procedures that had been in place and effective since before he
began working at American Steel, even after learning of the
delinquent state excise taxes.[32]

On May 18, 2009, Steve Dawson ("Dawson"), who began acting as
controller after Latiolais's departure, informed Arriondo that
Latiolais had been using employee payroll tax trust fund money to
pay creditors rather than the IRS and had been writing checks but
not releasing them.[33]  That was the first time Arriondo learned of
the unpaid taxes.[34]  On the same day, Dawson told Arriondo that
American Steel did not have enough money to pay the taxes owed to
the IRS.[35]  Latiolais had lied to Arriondo about American Steel's

―――――――――――――

[31]See Arriondo Deposition, Exhibit 14 to Motion for Summary
Judgment, Docket Entry No. 14-16, p. 11:41, p. 16:62, p. 15:59, pp.
28:112-29:113.

[32]See id.; see also Arriondo Declaration, Exhibit B to
Plaintiff's Response, Docket Entry No. 17-3, p. 2 ¶¶ 11-15;
Plaintiff's Response, Docket Entry No. 18, p. 9 ¶ 15.

[33]See Arriondo Deposition, Exhibit 14 to Motion for Summary
Judgment, Docket Entry No. 14-16, p. 4:15; Arriondo Declaration,
Exhibit B to Plaintiff's Response, Docket Entry No. 17-3, p. 2
¶¶ 11, 14, 15.

[34]See Arriondo Interrogatory Responses, Exhibit 3 to Motion for
Summary Judgment, Docket Entry No. 14-5, p. 1 Interrogatory 2.  See
also Arriondo Deposition, Exhibit 14 to Motion for Summary
Judgment, Docket Entry No. 14-16, p. 9:36, p. 10:38.  At the time,
American Steel had around 100 employees.  Id. at 5:20-6:21.

[35]See Arriondo Declaration, Exhibit B to Plaintiff's Response,
(continued...)

finances and ceased paying tax withholdings and child-support withholdings while assuring Arriondo that the company had enough money to pay employees.[36]   Latiolais had instructed her employees not to pay federal withholding taxes to the IRS.[37]

When he learned of the unpaid payroll taxes, Arriondo began shutting down the company and laying off employees.[38]   Arriondo met with a bankruptcy attorney approximately one week after learning of the unpaid taxes.[39]   The bankruptcy attorney told Arriondo to complete the shutdown of the company and to gather the necessary

---

[35](...continued)
Docket Entry No. 17-3, p. 2 ¶ 15

[36]See id. ¶¶ 11-15.

[37]See Affidavit of Patricia Bailey, Exhibit D to Plaintiff's Response, Docket Entry No. 17-5, ¶¶ 2-3 ("During 2008 through April of 2009, I worked as an Accounting Administrative Assistant at [American Steel] under the supervision of [Latiolais], CPA.  Ms. Latiolais was the Director of Finance, overseeing all of the financial, accounting, and payments for American Steel.  Donna Latiolais had full-decision making ability on what payments were issued by the company to all vendors and institutions.  During the time I worked with Donna she specifically instructed us not to pay federal withholding taxes to the IRS.  I had no knowledge that Ms. Latiolais had concealed the non-payment of this tax obligation from the company's management."); Affidavit of Lori LoPresti, Exhibit E to Plaintiff's Response, Docket Entry No. 17-6 (same).

[38]See Plaintiff's Response, Docket Entry No. 18, p. 7 ¶ 11; Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 17-3, pp. 2-3 ¶¶ 15-20.

[39]Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 17-3, p. 3 ¶ 19.

information for bankruptcy.[40]  American Steel filed for bankruptcy protection on June 5, 2009, eighteen days after Dawson informed Arriondo of the unpaid taxes.[41]

The United States asserts that Arriondo approved other payments and checks to employees and other creditors after he learned of the unpaid taxes.[42]  Arriondo received compensation from American Steel after he learned of the unpaid taxes because he continued to perform necessary functions to prepare the company for bankruptcy on the advice of the bankruptcy attorney.[43]  The bankruptcy attorney told him he was entitled to be paid for his services in shutting down the company because he was not an owner.[44]

---

[40]Id.

[41]Arriondo Deposition, Exhibit 14 to Motion for Summary Judgment, Docket Entry No. 14-16, p. 16:64-17:65; Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 17-3 p. 3 ¶¶ 18-20.

[42]See Motion for Summary Judgment, Docket Entry No. 14, pp. 12-13 ¶ 27.

[43]See Arriondo Interrogatory Responses, Exhibit 3 to Motion for Summary Judgment, Docket Entry No. 14-5, p. 4 Interrogatory 9.  See also Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 17-3, pp. 2-3 ¶¶ 15-20; Arriondo Deposition, Exhibit 14 to Motion for Summary Judgment, Docket Entry No. 14-16, p. 20:79; American Steel Building Company Voluntary Petition for Bankruptcy in the United States Bankruptcy Court, Southern District of Texas, Exhibit 6 to Motion for Summary Judgment, Docket Entry No. 14-8.

[44]See Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 17-3, p. 3 ¶ 19.  Arriondo asserts that "[a]fter the bankruptcy filing all American Steel transactions were under the direction of the bankruptcy trustee."  See Plaintiff's (continued...)

-11-

Arriondo admits that he had the authority to decide which creditors to pay, including paying the employee salaries that were paid after he learned of the unpaid taxes.[45] Arriondo admits that he approved payments and checks to "employees and government entities of American Steel" after he knew American Steel had unpaid payroll taxes.[46] Two payroll payments were made after Arriondo

---

[44](...continued)
Response, Docket Entry No. 18, p. 5 ¶ 2 (citing generally Arriondo Declaration and Dawson Declaration); see Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 17-3, p. 3 ¶ 20 ("The company filed for bankruptcy on June 5, 2009, 18 days after the deceit of Ms. Latiolais was known to me. . . . I continued assisting the Trustee for a few weeks.").

[45]See Plaintiff's Response, Docket Entry No. 18, p. 10 ¶ 18; Arriondo Deposition, Exhibit 14 to Motion for Summary Judgment, Docket Entry No. 14-16, p. 9:36 ("Q: You would agree that you wrote checks, though, even after you found out the taxes were owed? A: When I found out that the taxes were owed, that was May 18th. On 6-5 we filed for bankruptcy, so... Q: But in the interim after May 18th, you would agree that there were checks written that you signed and payments made to other creditors that were made even though the taxes were still owed; is that a fair statement? A: Yes, but if you look at the statement from 6-1 to 6-30, there's little to no activity on that account."), p. 15:58-59, p. 20:79-22:86 ("A: . . . Because I believe that I do have two payrolls because it was -- as I said before, there were two more payrolls after the bankruptcy, after we found out about this to Steve and myself, but there was only one payroll to the company because, you know, we closed down. Q: Well, these two are prior to the bankruptcy, correct? The 5-22 and 5-29? A: Yeah, true, you're right. You're right."); see also Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 17-3, pp. 2-4 ¶¶ 15-25.

[46]See Plaintiff's Response, Docket Entry No. 18, p. 10 ¶ 18. Arriondo contends that as a result of his actions, the Department of Treasury received $107,571.00 from the liquidation, substantially more than it would have had Arriondo not assisted the bankruptcy trustee.  Id. ¶ 16; In re: American Steel Building Company, Chapter 7 Trustee's Final Account and Distribution Report Certification That the Estate Has Been Fully Administered and
(continued...)

learned of the unpaid taxes (all taxes were paid on these payroll disbursements), and he and Steve Dawson remained on payroll until the end of June.[47]   Weekly employees were paid one week in arrears on the following Friday.   They were paid on May 22nd for work that had previously been performed.[48]   The final payroll was on May 29, 2009, but many of those checks bounced.[49]

Arriondo denies that he decided to pay other creditors before the IRS.[50]   The United States relies on a sampling of cancelled

---

[46](...continued)
Application to Be Discharged (TDR), Exhibit I to Plaintiff's Response, Docket Entry No. 17-9.

[47]See Arriondo Interrogatory Responses, Exhibit 3 to Motion for Summary Judgment, Docket Entry No. 14-5, p. 4 Interrogatory 9; Arriondo Deposition, p. 9:36, p. 15:58-59, p. 20:79-22:86.   See also American Steel Payroll Register, Exhibit 10 to Motion for Summary Judgment, Docket Entry No. 14-12.

[48]See Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 17-3, pp. 2-3 ¶ 17; Arriondo Deposition, Exhibit 14 to Motion for Summary Judgment, Docket Entry No. 14-16, p. 15:57, pp. 23:90-24:94; American Steel Payroll Register, Exhibit 10 to Motion for Summary Judgment, Docket Entry No. 14-12.

[49]See Arriondo Deposition, Exhibit 14 to Motion for Summary Judgment, Docket Entry No. 14-16, p. 23:90-24:94; Arriondo Declaration, Docket Entry No. 17-3, p. 3 ¶ 18 ("Payment for the work performed the week beginning May 18, 2009 was May 29, 2009."). This was for "work performed by employees during the shutdown process."   See  Plaintiff's Response,  Docket Entry No. 18, p. 11 ¶ 18.

[50]"At no time did I authorize or direct payments to creditors ahead of the IRS."   Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 17-3, p. 3 ¶ 24.

checks written after the period in question,[51] American Steel's A/P Check Register for 2008 and 2009,[52] Arriondo's deposition testimony, and the bankruptcy filings.[53]  Specifically, the United States points to a $30,000 payment to First Steel Source LLC on May 27, 2009, a $26,355 payment to North Shore Supply Company on May 28, 2009, and $7,500 in two June 2009 payments to American Steel's bankruptcy counsel.[54]  Arriondo acknowledges that the first two payments appear on the bankruptcy schedule, but argues that the schedule contains mistakes because these payments are not reflected

---

[51]Exhibit 8 to Motion for Summary Judgment, Docket Entry No. 14-10, p. 1 (Pay to: TX Child Support SDU, dated 5/22/2009); p. 2 (Pay to: Texas CDSU, dated 5/22/2009); p. 3 (Pay to: CDR Transportation Services, dated 5/29/2009); p. 4 (Pay to: E & A Hotshots, dated 5/18/2009); p. 5 (Pay to: Texas Board of Professional Engineers, dated 5/22/2009).

[52]See Exhibit 9 to Motion for Summary Judgment, Docket Entry No. 11, pp. 2, 14, 16, 22, 32-33, 39, 49, 57, 60, 63-66, 73, 76-77, 79-80.

[53]See Motion for Summary Judgment, Docket Entry No. 14, p. 10 ¶ 18 (citing Arriondo Deposition, Exhibit 14 to Motion for Summary Judgment, Docket Entry No. 14-16, p. 9:36, p. 15:58-59 ("I don't know how many creditors were paid but if the payments – payments were issued, it was very –– very minimum because we had – at that time we had very little money also.  So we did not continue - our operations really literally came to a halt the moment I found out."); pp. 20:79-22:86 (the attorney received a retainer authorized by the company and discussing the payments listed on the bankruptcy schedule).  See also American Steel Building Company Voluntary Petition for Bankruptcy in the United States Bankruptcy Court, Southern District of Texas, Exhibit 6 to Motion for Summary Judgment, Docket Entry No. 14-8, pp. 65-81.

[54]See Motion for Summary Judgment, Docket Entry No. 14, p. 13 ¶ 27.

on the company's bank statements for the month.[55]   He also disputes
that he authorized payments to American Steel's bankruptcy counsel
in June of 2009.[56]   Arriondo and Dawson stated that the company made
a $9,000 payment deposit for new steel in an attempt to complete a
large order to raise money for the taxes, but Arriondo asserts that

---

[55]See Plaintiff's Response, Docket Entry No. 18, p. 13 ¶ 27;
Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket
Entry No. 17-3, p. 3 ¶ 23 ("The Company did not make [these
payments].   The Bankruptcy Statement of Financial Affairs listed
them, but this was inaccurate. The checks did not clear the bank
account as shown on Exhibit G.   By this time, the Company was
already shut down and I was getting together information for the
bankruptcy filing.   I was not authorizing payments to creditors.").
Plaintiff's Response cites Exhibit G, Docket Entry No. 17, which is
the Form 941 for Fourth Quarter 2008.   Exhibit K, Docket Entry No.
17-11, is American Steel's Bank Statement from May 2009.   The bank
statement shows an insufficient funds fee charged for Check No.
101764 on May 27th, and an insufficient funds fee charged for Check
No. 101671 on May 28, 2009.   Id. at 8.   Arriondo argues that these
alleged payments may not be considered anyway because the
bankruptcy schedule is hearsay and they cannot be put in an
admissible form.   See Plaintiff's Response, Docket Entry No. 18, p.
13 ¶ 27 (citing Fed. R. Civ. P. 56(d)).   He does not address the
check register or cancelled checks.   However, the court does not
rely on the information in the bankruptcy schedule in reaching its
conclusion.

[56]See Plaintiff's Response, Docket Entry No. 18, p. 13 ¶ 27;
Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket
Entry No. 17-3, p. 3 ¶¶ 19 ("[The bankruptcy attorney] advised me
that payment for his services of $7,500.00 would be approved by the
court and trustee."), 23, 24.   "Arriondo denies he made numerous
payments to himself after learning of the unpaid taxes, including
salary payments.   Plaintiff's Response, Docket Entry No. 18, p. 13
¶ 27.   Earlier in his Response, however, and in his declaration,
deposition, and answers to interrogatories, he admits that he
received salary payments after learning of the unpaid taxes.   He
also admitted that he received insurance reimbursements and car
allowances along with the salary payments as part of his
compensation package after May 18, 2009.   See Arriondo Deposition,
Exhibit 14 to Motion for Summary Judgment, Docket Entry No. 14-16,
p. 21:84–22:86.

this was not a payment to a creditor.[57]  Rather than fulfilling the

order, the supplier applied the $9,000 to American Steel's past due

payments.[58]  Discussing his actions after he discovered the unpaid

payroll taxes, Arriondo testified:

> Q:  So was the hope then to get money in to be able to
> use to pay the IRS?
>
> A:  To pay that debt. That is -- that became in the short
> period of time before when I found out till the very end
> when we filed for bankruptcy, that became the number one
> concern.  Let's see if we can get money here, something,
> a loan or whatever so that we can pay this off.[59]

However, Arriondo denies that he kept American Steel operating even

after he learned of the unpaid taxes in an attempt to generate new

revenue with which to pay taxes.[60]  Arriondo also denies that he

---

[57]See Plaintiff's Response, Docket Entry No. 18, p. 14 ¶ 27;
Arriondo Deposition, Exhibit 14 to Motion for Summary Judgment,
Docket Entry No. 14-16, pp. 22:87–88; Arriondo Declaration, Docket
Entry No. 17-3, p. 2 ¶ 16.

[58]See Dawson Declaration, Exhibit C to Plaintiff's Response,
Docket Entry No. 17-4, p. 1 ¶ 7 ("American Steel had a potential
sale that could be consummated if sufficient steel could be
acquired.  Mr. Arriondo and I discussed making a sale and using the
proceeds to reduce the amount due the IRS.  We thought the IRS
would then accept a payment plan for the remainder.  A deposit was
made to a supplier in the amount of $9,000.00 that was for new
steel.  Unfortunately the supplier offset the deposit to past due
invoices and did not deliver any steel.").

[59]Arriondo Deposition, Exhibit 14 to Motion for Summary
Judgment, Docket Entry No. 14-16, p. 23:89.  See also id. at
20:79-24:93 (discussing the bankruptcy schedules).

[60]See Plaintiff's Response, Docket Entry No. 18, p. 13 ¶ 27
(citing Arriondo Declaration, Exhibit B to Plaintiff's Response,
Docket Entry No. 17-3).

kept the company operating by paying other creditors first, hoping
that there would be enough money to pay the taxes in the future.[61]

Arriondo admits that American Steel's bank statements for the
period in question and subsequent months (prior to the bankruptcy
filing) show that the company received hundreds of thousands of
dollars with which American Steel could have paid payroll taxes.[62]
Arriondo denies, however, that the statements show that American
Steel received hundreds of thousands of dollars during April and
May of 2009[63] and denies that it had enough to pay the taxes for the
period in question after May 18, 2009.[64]  Arriondo asserts that if

---

[61]See  id.  (citing  Arriondo  Declaration,  Exhibit  B  to
Plaintiff's Response, Docket Entry No. 17-3).

[62]See Motion for Summary Judgment, Docket Entry No. 14, p. 11
¶ 21; Plaintiff's Response, Docket Entry No. 18, p. 11 ¶ 21;
American Steel Building Inc. Account Activity Summary from October
of 2008 thru May of 2009, Exhibit 11 to Motion for Summary
Judgment, Docket Entry No. 14-13.

[63]See American Steel Building Inc. Account Activity Summary
from  October of 2008 thru May of 2009, Exhibit 11 to Motion for
Summary Judgment, Docket Entry No. 14-13, pp. 1-15 (account
activity from April and May of 2009).

[64]See Plaintiff's Response, Docket Entry No. 18, p. 11 ¶ 21;
Motion for Summary Judgment, Docket Entry No. 14, p. 11 ¶ 21.  See
also Arriondo Deposition, Exhibit 14 to Motion for Summary
Judgment, Docket Entry No. 14-16, p. 9:35 ("Q:  [T]his statement
for this month indicates that American Steel received deposits in
the amount of 345,000 for the month of May; do you see that?  A:
I see that.  Q:  And payments were made or withdrawals were made in
the amount of 350,000, roughly, 351,000; do you see that?  A:  Yes,
I do.  Q:  Do you know what that money was used for?  A:  Not
exactly.  Only to pay.  I'm sure we had an incredible amount of
bills to pay and steel to buy and same things that we've always
paid for.")-10:40, p. 11:42-43.

he had known of the unpaid taxes before May 18, 2009, he would have shut the company down earlier.[65]

The IRS assessed American Steel's unpaid taxes for the period in question against Arriondo and is seeking to recover the trust fund penalty under I.R.C. § 6672.[66]   Arriondo filed his Complaint on September 23, 2014.[67]   He seeks to recover $100.00 paid to the IRS and attorneys fees, to be found not liable as a responsible person under I.R.C. § 6672, and to recover administrative costs and litigation costs pursuant to 26 U.S.C. § 7430(a).[68]   The United States filed an answer and counterclaim, seeking an order that Arriondo is not entitled to any refund or other relief, and is indebted to the United States in the amount of $365,537.20 plus interest.[69]   The United States filed its Motion for Summary Judgment on April 28, 2016, after a period of discovery.

--------

[65]See Arriondo Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 17-3, p. 3 ¶ 20.

[66]See IRS Forms 4340 for the period ending December 31, 2008, and the period ending March 31, 2009, Exhibit 13 to Motion for Summary Judgment, Docket Entry No. 14-15; Declaration Under 28 U.S.C. § 1746 of Brett A. Crow and attached schedule of Unpaid Tax Liability for Arriondo, Exhibit 15 to Motion for Summary Judgment, Docket Entry No. 14-17.

[67]Complaint, Docket Entry No. 1.

[68]Id. at 4.

[69]See United States of America's Answer to Plaintiff's Original Complaint and Counterclaim, Docket Entry No. 8, pp. 2-4.

## II.  Standard of Review

Summary judgment is appropriate if the movant establishes that there is no genuine dispute about any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2510 (1986).  The moving party is entitled to judgment as a matter of law if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986).

A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (quoting Celotex, 106 S. Ct. at 2553).  "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."  Id.  If, however, the moving party meets this burden, "the nonmovant must go beyond the pleadings" and produce evidence that specific facts exist over which there is a genuine issue for trial.  Id. (citing Celotex, 106 S. Ct. at 2553-54).  The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita

_Electric Industrial Co., Ltd. v. Zenith Radio Corp._, 106 S. Ct. 1348, 1356 (1986).

"In order to avoid summary judgment, the nonmovant must identify specific facts within the record that demonstrate the existence of a genuine issue of material fact." _CQ, Inc. v. TXU Mining Co., L.P._, 565 F.3d 268, 273 (5th Cir. 2009). "The party must also articulate the precise manner in which the submitted or identified evidence supports his or her claim." _Id._ (internal quotation marks and citation omitted). "When evidence exists in the summary judgment record but the nonmovant _fails even to refer to it_ in the response to the motion for summary judgment, that evidence is not properly before the district court." _Id._ (same).

"[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." _Reeves v. Sanderson Plumbing Products, Inc._, 120 S. Ct. 2097, 2110 (2000). The court resolves factual controversies in favor of the nonmovant, but only "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." _Little_, 37 F.3d at 1075.

### III.   **Analysis**

**A.   26 U.S.C. § 6672 - Trust Fund Recovery Penalty**

Employers are required to withhold their employees' share of federal social security and income taxes from the employees' wages. _See_ 26 U.S.C. §§ 3102(a), 3402(a). The employer holds these "trust

fund taxes" in trust for the benefit of the United States.  See Slodov v. United States, 98 S. Ct. 1778, 1783 (1978) (citing 26 U.S.C. § 7501(a)); Barnett v. Internal Revenue Service, 988 F.2d 1449, 1453 (5th Cir. 1993); Howard v. United States, 711 F.2d 729, 733 (5th Cir. 1983).  To ensure that the taxes are remitted to the United States, 26 U.S.C. § 6672(a) imposes a penalty equal to the entire amount of the unpaid taxes:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over . . . .

"Liability under § 6672 thus is composed of two elements: (1) that the taxpayer was a 'responsible person,' and (2) that the taxpayer willfully failed to collect, account for, or pay over such taxes." Conway v. United States, 647 F.3d 228, 232 (5th Cir. 2011) (citation omitted); Barnett, 929 F.2d at 1452.

B.   **Responsible Person**

The term "person" includes "an officer or employee of a corporation, or a member or employee of a partnership who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs." 26 U.S.C. § 6671(b).  The statute imposes liability on any person who is required to collect, truthfully account for, or pay over the withheld taxes and

willfully fails to do so.  <u>See</u> <u>Barnett</u>, 988 F.2d at 1453; <u>Turnbull</u> <u>v. United States</u>, 929 F.2d 173, 178 (5th Cir. 1991); <u>Wood v. United</u> <u>States</u>, 808 F.2d 411, 414 (5th Cir. 1987).  Thus, involvement in either collecting, truthfully accounting for, or paying over taxes is sufficient; liability is not limited to those persons in a position to perform all three of the § 6672 enumerated duties.  <u>See</u> <u>Slodov</u>, 98 S. Ct. at 1787; <u>Verret v. United States</u>, 542 F. Supp. 2d 526, 533 (E.D. Tex. 2008).  The United States argues that Arriondo was a responsible person for the period in question, and Arriondo does not dispute that he was a responsible person in his response.[70]

The Fifth Circuit "takes a broad view of who is a responsible person under § 6672."  <u>Logal v. United States</u>, 195 F.3d 229, 232 (5th Cir. 1999) (citation omitted); <u>see also</u> <u>Barnett</u>, 988 F.2d at 1454, 1456 ("We first observe that cases *not* finding § 6672 responsibility are relatively few and far between."); <u>Raba v.</u> <u>United States</u>, 977 F.2d 941, 943 (5th Cir. 1992); <u>Gustin v. United</u> <u>States</u>, 876 F.2d 485, 491 (5th Cir. 1989).  Responsibility is a matter of status, duty, power and authority.  <u>Wood</u>, 808 F.2d 415 (citing <u>Howard</u>, 711 F.2d at 734).  It is not necessary that an

---

[70]<u>See</u> Plaintiff's Response, Docket Entry No. 18, p. 5 (His "statement of issues to be decided by the court" identifies a single issue: "Whether Mr. Arriondo willfully failed to pay over the collected payroll taxes withheld from the wages of American Steel's employees for the fourth quarter of 2008 and the first quarter of 2009 as provided by 26 U.S.C. Section 6672(a) even though he did not have knowledge of the failure to pay until May 18, 2009, after the quarterly tax returns were filed?")

individual have the final or exclusive word as to which creditors
should be paid in order to be subject to liability under § 6672.
Verret, 542 F. Supp. 2d at 534 (citing United States v. Bogard,
Civ. Action No. 4-88-492-K, 1991 WL 101535, at *4 (N.D. Tex. Apr.
19, 1991). In fact, one need not even have knowledge that he has
such authority. Id.; Barnett, 988 F.2d at 1454 ("[R]esponsibility
does not require knowledge that one has that duty and authority.").

Recognized indicia of responsible person status include:
"whether such a person: (i) is an officer or member of the board of
directors; (ii) owns a substantial amount of stock in the company;
(iii) manages the day-to-day operations of the business; (iv) has
the authority to hire or fire employees; (v) makes decisions as to
the disbursement of funds and payment of creditors; and (vi)
possesses the authority to sign company checks." Barnett, 988 F.2d
at 1455 (citations omitted). No single factor is dispositive. Id.
All of these factors apply to Arriondo to some degree except the
second.

The statute applies to any responsible person, not just the
person most responsible for paying taxes. Barnett, 988 F.2d at
1455 (citing Howard, 711 F.2d at 737); see also Neckles v. United
States, 579 F.2d 938, 940 (5th Cir. 1978) ("[T]he fact that others
may also have had the duty and authority to remit the taxes does
not relieve the appellant of section 6672 liability."). Thus, the
fact that Latiolais had primary responsibility for paying taxes

-23-

does not absolve Arriondo from liability. See Barnett, 988 F.2d at 1454-55 ("[A] person may be a responsible person for purposes of the statute even though he does not know that withholding taxes have not been paid, and he does not cease to be a responsible person merely by delegating the responsibility to others. Moreover, . . . there usually are [] multiple responsible persons in any company. . . . The crucial inquiry is whether a party such as Barnett, by virtue of his position . . . could have had 'substantial' input into such decisions, had he wished to exert his authority.") (citations omitted). The court thus concludes that Arriondo was a "responsible person" for the time he worked at American Steel.

## C. Willfulness

A responsible person is only liable under § 6672 if his failure to collect or account for or pay over payroll taxes was "willful." See 26 U.S.C. § 6672; Wood, 808 F.2d at 415. "[O]nce the Government offers an assessment [of penalty taxes] into evidence, the burden of proof is on the taxpayer to disprove his responsible-person status or willfulness." Barnett, 988 F.2d at 1453 (citations omitted); see also Mazo v. United States, 591 F.2d 1151, 1155 (5th Cir. 1979) (citing Anderson v. United States, 561 F.2d 162, 165 (8th Cir. 1977); Liddon v. United States, 448 F.2d 509, 513-14 (5th Cir. 1971)). Arriondo argues that there are genuine issues of material fact as to whether he acted willfully

-24-

and that his actions in shutting the company down and filing for bankruptcy were reasonable.[71]

1.   Payments to Other Creditors

The United States argues that Arriondo acted willfully as a matter of law in paying creditors other than the IRS after he knew of the unpaid taxes:

> Arriondo admitted that (i) he aware that American Steel was facing "challenges" financially due to the economic downturn that began in 2008, (ii) the Company "always had a challenge" financially and "struggle[ed] with cash," (iii) he was aware "towards the end of '08 and certainly in 2009 that the company was having financial difficulties," (iv) he knew American Steel was having serious tax issues in April 2009 (relating to the State of Texas levy for unpaid excise taxes), and (v) he knew of the unpaid payroll taxes by [May 18, 2009]. Despite this knowledge, Arriondo paid, and authorized payment to, creditors other than the IRS (as well as payments to American Steel's employees, including himself) after he knew of the unpaid taxes.[72]

Normally, willfulness is proved "by evidence that the responsible person paid other creditors with knowledge that withholding taxes were due at the time to the United States."

---

[71]See Plaintiff's Response, Docket Entry No. 18, pp. 14-17. Arriondo argues that he acted reasonably after he discovered the unpaid taxes, but does not assert a "reasonable cause" defense. See Logal, 195 F.3d at 233 ("[A]lthough we have recognized conceptually that a reasonable cause may militate against a finding of willfulness, no taxpayer has yet carried that pail up the hill. No such defense may be asserted by a responsible person who knew that the withholding taxes were due, but who made a conscious decision to use corporate funds to pay creditors other than the government.") (citations and quotations omitted).

[72]See Motion for Summary Judgment, Docket Entry No. 14, pp. 20-26.

Barnett, 988 F.2d at 1457 (citing Gustin, 876 F.2d at 492).
"Willfulness under § 6672 requires only a voluntary, conscious, and
intentional act, not a bad motive or evil intent." Barnett, 988
F.2d at 1457 (citing Mazo, 591 F.2d at 1154; Gustin, 876 F.2d at
492). Thus, a "considered decision not to fulfill one's obligation
to pay the taxes owed, evidenced by payments made to other
creditors in the knowledge that the taxes are due, is all that is
required to establish willfulness." Id. (citing Howard, 711 F.2d
at 736 (internal quotations omitted)).

Arriondo contends that Latiolais' deception prevented him from
taking action earlier and that "[n]o payments to creditors of
American Steel were made after [he] learned of the failure to
pay."[73]   However, a responsible person who learns of the
underpayment of taxes must use later-acquired unencumbered funds to
pay the taxes; failure to do so constitutes willfulness. See
Barnett, 988 F.2d at 1458 (citing Mazo, 591 F.2d at 1157; Turnbull,
929 F.2d at 179-80; Wood, 808 F.2d at 416; Garsky v. United States,
600 F.2d 86, 91 (7th Cir. 1979)); see also Mazo, 591 F.2d at 1157
("In the case of individuals who are responsible persons both
before and after withholding tax liability accrues . . . there is
a duty to use unencumbered funds acquired after the withholding
obligation becomes payable to satisfy that obligation; failure to
do so when there is knowledge of the liability . . . constitutes

----

[73]See Plaintiff's Response, Docket Entry No. 18, p. 15.

willfulness."); <u>Logal</u>, 195 F.3d at 232; <u>Lencyk v. Internal Revenue Service</u>, 384 F. Supp. 2d 1028, 1036 (W.D. Tex. 2005).

It is undisputed that Arriondo and Dawson agreed to attempt one more job to earn the money to pay the taxes, and that they spent at least $9,000 attempting to buy steel after learning of the unpaid taxes.   The Fifth Circuit has "not accepted the mere reasonable expectation of sufficient funds at a later date as a defense to a charge of willful failure to comply with the commands of § 6672." <u>Bowen v. United States</u>, 836 F.2d 965, 968 (5th Cir. 1988); <u>Behrman v. United States</u>, Civ. Action No. 4:15-CV-286, 2016 WL 1392338, at *4 (E.D. Tex. April 8, 2016) ("The hope that there will be sufficient money with which to pay the taxes in the future is no defense." (citing <u>Newsome v. United States</u>, 431 F.2d 742, 746 (5th Cir. 1970)).[74]   Even if there was not enough money to fully

------

[74]A responsible person can also be liable under § 6672 based on use of withheld funds for other corporate purposes *before* the date for the company to pay over the taxes.  <u>See</u> <u>Newsome</u>, 431 F.2d at 745-46 ("The responsible officer's actions before the due date for payment of the withheld taxes satisfies the 'willfulness' requirement under section 6672: when the responsible officer . . . knows that the withheld funds are being used for other corporate purposes, regardless of his expectation that sufficient funds will be on hand on the due date for payment over to the government. . . .  However, he subjects himself to liability under 6672 when he voluntarily and consciously 'risks' the withheld taxes in the operation of the corporation, and subsequently the corporation is unable to remit the withheld taxes.").  Here, although the taxes for the period in question were already past-due, Arriondo entered into a deal that he hoped would lead to more funds, voluntarily and consciously risking that money in the operation of the corporation. <u>See</u> <u>id.</u> ("One example of using withheld taxes for other corporate purposes would be when, at any time during the quarter, the (continued...)

satisfy the back taxes owed to the IRS on May 18, 2009, Arriondo allowed deposits for new steel to be paid out of what limited funds the company had.[75]  He thus used unencumbered funds to be used for something other than the taxes after discovering the unpaid taxes.[76]

Arriondo also admits that he continued to pay salaries after learning of the tax liability.  The Fifth Circuit addressed a similar situation in Logal, 195 F.3d at 232 (emphasis added), recognizing that paying "other creditors" includes employee salaries:

> Between March and July 1994, after Logal knew that the withholding taxes had not been paid, deposits totaling over $450,000 were made into Meridien's accounts in Dallas.  However, Logal used these funds to pay other creditors, including his wages and the wages of other employees.  These later acquired funds were not "encumbered" under § 6672; thus Logal was required to use them to pay the delinquent withholding taxes.  His failure to do so makes him a willful violator of § 6672 and he cannot escape liability by shifting the blame to others.

---

[74](...continued) responsible officer is aware that the amount of corporate funds is lower than the amount of taxes withheld for the quarter and allows, or has knowledge of, the corporation's continuing to pay other corporate creditors.").

[75]Arriondo is careful to make the distinction that he did not make a payment to a creditor, although the supplier immediately applied the deposit to American Steel's past due invoices.

[76]Arriondo contends that the bankruptcy schedule (which he reviewed and signed) contains mistakes because two payments to creditors reflected on it did not occur.  In fact, those checks bounced due to insufficient funds.  He also argues that the bankruptcy schedule is hearsay and cannot be considered.

-28-

In <u>United States v. Kennedy</u>, Civ. Action No. SA-10-CV-341-XR, 2011 WL 2636096, at *6 (W.D. Tex. July 5, 2011), the court addressed a situation nearly identical to Arriondo's.  There, the government presented evidence that one plaintiff signed at least five IRS Form 941s in 2004 showing that the taxes remained unpaid. <u>Id.</u>  That plaintiff testified that he did not learn of the unpaid taxes until 2003 or 2004, and claimed that he "did not prepare the tax returns, and he did not review the information on the Form 941s that Gaona presented for him to sign, because he was led to believe that the taxes were being paid."  <u>Id.</u>  Granting summary judgment for the government, the court held:

> If the only evidence of Kennedy's knowledge was the signatures on the Form 941s, there may be a dispute of material fact as to his knowledge and therefore his willfulness.  Kennedy also testified at his deposition, however, that all employees continued to be paid all the way until the termination of the company, even after he learned about the unpaid taxes in 2003 or 2004.  He also testified that he signed payroll checks to Forero after he knew about the unpaid taxes.  Kennedy's admission that he signed paychecks and knew that employees continued to get paid, even after knowing about the unpaid taxes, amounts to willfulness as a matter of law under Fifth Circuit precedent.

<u>Id.</u> (citations omitted).  Other decisions also recognize that choosing to pay one's own or other employee salaries can constitute willful failure to remit trust fund taxes.  <u>See, e.g.,</u> <u>Turnbull</u>, 929 F.2d at 180 ("Evidence was introduced at trial indicating that Foster paid other creditors with knowledge that the payroll taxes were due. . .  Foster testified that throughout 1981 he authorized

checks to pay other DJT expenses, including outstanding loans, lease obligations, and utilities. <u>In addition, in December 1981, after Foster concedes that he knew about the payroll tax deficiency, Foster directed Big Sky to send a payroll check to DJT</u> . . . .") (emphasis added); <u>Behrman</u>, 2016 WL 1392338, at *4 ("[Plaintiff] admitted that he authorized the payment of creditors in lieu of the IRS after learning of the unpaid taxes. <u>He even admitted that he was paid after learning of the unpaid taxes</u>.") (emphasis added); <u>Kennedy</u>, 2011 WL 2636096, at *5-6 (W.D. Tex. July 5, 2011) ("Gaona testified in his deposition that he knew that the company was unable to pay its taxes, and he knew that the IRS had sent a letter inquiring about the outstanding taxes. <u>Even with this knowledge, Gaona continued to receive his salary, as did M.S. Patrol's other employees</u>. Gaona testified that he and Kennedy authorized these salary payments as well as rent payments . . . [and] kept M.S. Patrol in business and operating for three years after knowing about the unpaid taxes. [This] . . . establishes that Gaona willfully failed to collect and pay the taxes due to the IRS.") (emphasis added); <u>Sutton v. United States</u>, 194 F. Supp. 2d 559, 565 (E.D. Tex. 2001) ("[Plaintiff's] deposition testimony shows that <u>he continued to pay employees and creditors</u> up until about the time the doors of the company were locked in 1993. The fact that he admits he was aware the withholding taxes had not been paid and he continued to pay creditors satisfies the first

willfulness test.") (emphasis added).[77]  Thus, the court concludes that Arriondo acted willfully when he paid himself and other employees and used money in an attempt to purchase new steel.

Finally, a responsible person who is found to have acted willfully for at least one quarter is a willful actor for preceding quarters, even if he was unaware of the unpaid payroll tax liability in those earlier quarters. For example, in Mazo, 591 F.2d at 1155-56, several corporate officers were found to be responsible persons, but did not learn of the unpaid taxes until October 6, 1969. None of the officers knew of the unpaid taxes while they were accruing in the first three quarters of 1969. Id. at 1156. However, each officer signed a check to a creditor other than the IRS after October 6th.[78] The court found that the officers acted willfully for each quarter, even though they were unaware of the unpaid taxes during the quarters in which they accrued. Id. ("The real issue here is whether the officers assessed acted willfully in failing to discharge their duty after October 6.").

Similarly, in Wood, 808 F.2d at 416, the Court held that because Wood received notice that employment taxes were past due by

_____

[77]Arriondo argues that child support payments, administrative payments, and employee salaries are a higher priority in bankruptcy than IRS withholdings. See Plaintiff's Response, pp. 15-16 (citing Bankruptcy Code § 507). However, the payments at issue were made after May 18, 2009, and before the company filed for bankruptcy.

[78]One officer, Mr. Sadler, did not sign such a check. However, Sadler also acted willfully because he actually knew the taxes were unpaid and took no action. Mazo, 591 F.2d at 1156.

a letter from the IRS dated September 17, 1979, and conceded that after that date he signed checks paying to creditors more than the amount of unpaid withholding taxes, he acted willfully as to all taxes unpaid before he received notice that taxes were past due. See also Turnbull, 929 F.2d at 180 (holding that because the plaintiff was a responsible person for all quarters of 1981, the government did not have to prove that he knew about the unpaid taxes prior to October 1981 in order to hold him liable for the willful failure to pay taxes for all four quarters of 1981). Therefore, Arriondo can be found to have acted willfully, even if Latiolais was actively concealing the unpaid taxes, Arriondo did not discover the non-payment until after the period in question, and all payroll taxes had been properly paid in the past. In light of this authority, the court concludes that Arriondo acted willfully.

    2.   <u>Reckless Disregard</u>

The United States also argues that Arriondo acted with reckless disregard. A person acts willfully if he recklessly disregards a known or obvious risk that the taxes may not be remitted to the government. See Brown v. United States, 591 F.2d 1136, 1140 (5th Cir. 1979); Gustin, 876 F.2d at 492. The United States argues that it was reckless of Arriondo, as CEO, president, and treasurer of the company, to do nothing to ensure the taxes for

the period in question were eventually paid despite his knowledge that the company was in dire financial straits.[79]

"Mere negligence does not establish willfulness." <u>Payne v. United States</u>, 383 F. App'x 483, 488 (5th Cir. 2010) (citing <u>Gustin</u>, 876 F.2d at 492). However, "[t]his Court has also held that reckless disregard includes a 'fail[ure] to investigate or to correct mismanagement after being notified that withholding taxes have not been duly remitted.'" <u>Id.</u> (citations omitted). In <u>Troost v. United States</u>, Civ. Action No. 3:13-CV-4399-M-BF, 2015 WL 5258812, at *3 (N.D. Tex. Aug. 12, 2015), report and recommendation accepted, Civ. Action No. 3:13-CV-4399-M-BF, 2015 WL 5279096 (N.D. Tex. Sept. 9, 2015), the government argued that Mrs. Troost acted willfully because

> [Mrs.] Troost also demonstrated a reckless disregard because she should have known that there was a risk that [the company's] payroll taxes may not paid for the first quarter of 2009 through the fourth quarter of 2012 due to the company's financial problems during that time frame. The government points to Mr. Troost's deposition transcript wherein he states that he informed Mrs. Troost prior to 2009 that [] the company was behind on payments to vendors and its payroll taxes. Further, the government points to Mr. Troost's statements that when [the company] needed money, he would inform his wife and that the Troosts contributed money to the company to keep it operating. In addition, the government points to a promissory note showing that Mrs. Troost loaned [the company] $169,000.00 between 2006 and 2009. (record citations omitted).

---

[79]Motion for Summary Judgment, Docket Entry No. 14, pp. 21-23.

Because the government presented sufficient summary judgment evidence in support of its argument that the Troosts "willfully and/or recklessly" failed to pay payroll taxes and the Troosts failed to controvert that evidence, the court granted summary judgment for the government. Id. at *4.

Similarly, Arriondo knew that the company was (and had been) struggling financially, that Latiolais had failed to pay state excise taxes in 2008, and that Arriondo had needed to advance the company $20,000 to cover employee payroll in early 2009. He testified that Latiolais told him that she had not paid the state taxes due to lack of funds. Despite this knowledge, particularly of Latiolais' failure to pay the state taxes, he did not review or inquire into the status of other tax payments. Thus, Arriondo failed to correct mismanagement after being notified that some taxes had not been duly remitted. Although the unpaid taxes were not federal employment taxes, this behavior is similarly reckless. See Verret, 542 F. Supp. 2d at 539 ("If a responsible officer knows the corporation has recently incurred a payroll tax delinquency and is aware of the deteriorating affairs of the corporation, he runs the risk of being held personally liable for the unpaid withheld payroll taxes if he fails to take steps to ascertain the state of the payroll tax liabilities or to institute effective financial controls to guard against nonpayment.") (citation omitted).

## IV.   Conclusions and Order

Viewing the evidence submitted in the light most favorable to Arriondo and drawing reasonable inferences in his favor, the court concludes that Arriondo has failed to raise a genuine issue of material fact as to his status as a responsible person who acted willfully. United States of America's Motion for Summary Judgment Against W. Raul Arriondo (Docket Entry No. 14) is therefore **GRANTED**. The court **ADJUDGES** and **DECREES** that Arriondo is indebted to the United States in the amount of $359,567.73 as of April 29, 2016, plus pre-judgment and post-judgment interest from April 29, 2016.

The United States is ordered to provide a calculation of pre-judgment interest to Arriondo's counsel by July 29, 2016. If the parties cannot agree on the amount of pre-judgment interest, the court will conduct a hearing on August 5, 2016, at 3:00 p.m. If the parties agree on the amount of pre-judgment interest, the parties will submit a proposed Final Judgment, agreed on as to form, including the agreed amount of pre-judgment interest.

SIGNED at Houston, Texas, on this 22nd day of July, 2016.

SIM LAKE
UNITED STATES DISTRICT JUDGE